[No. A023426. First Dist., Div. Four. Sept. 26, 1985.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Appellant, v. CLAUDE M. THOMPSON, Defendant and Respondent.

COUNSEL

John K. Van de Kamp, Attorney General, Gloria F. DeHart and Mary A. Roth, Deputy Attorneys General, for Plaintiff and Appellant.

Timothy J. Lee, Arnold C. Ellis and Thomas W. Pulliam for Defendant and Respondent.

OPINION

**POCHÉ, J.**—The City and County of San Francisco appeals from a judgment denying the county reimbursement from a father for public assistance funds paid to his child and her mother for any period prior to the date of a court order establishing the father's liability for child support.

## I.

After trial by the court on stipulated facts, the court found that reimbursement claims upon fathers against whom there is no order for child support but whose children have received public assistance denies the fathers equal protection because no similar retrospective liability existed for fathers against whom there is no order for child support but whose children have not received public assistance. We reverse, finding that there is a rational basis for the Legislature's differential treatment embodied in Welfare and Institutions Code section 11350[1] of parents whose offspring receive public assistance.

Claude Thompson is the father of Karina Thompson, born to Rochelle Ginethal on March 13, 1971. The parents, who were never married, parted ways in 1972 in Philadelphia. In 1975 Thompson saw the mother and daughter again in San Francisco, but did not learn that his daughter needed financial aid. Beginning April 1, 1977, mother and daughter began receiving aid to families with dependent children (hereafter AFDC) from the County of

---

[1]All subsequent references are to the Welfare and Institutions Code unless otherwise indicated.

San Francisco. Those benefit payments totalled $11,579 by April 1, 1981, although the parties stipulated that Thompson would only be liable for $1,000 or the amount which he had the ability to pay from 1977 to 1981, less what he had actually contributed during that period.

In January 1979, Thompson learned from the San Francisco District Attorney's Office that Karina and her mother were receiving AFDC payments. Thompson acknowledged paternity of Karina and stipulated to an order requiring that he pay $50 a month toward her support beginning April 1, 1981. Thompson's contention, however, that he was not liable for benefits paid prior to the entry of the child support order, was accepted by the trial court. It found that section 11350 is a denial of equal protection because "[t]here is no reasonable basis for treating absent fathers whose children are support[ed] by public assistance differently than absent fathers whose children are not support[ed] by public assistance."

## II.

The trial court held section 11350 unconstitutional on its face as violative of the equal protection guarantee of the California Constitution because that section treats differently, without a rational basis, two classes of noncustodial parents—those whose children are recipients of public assistance and those whose children are not.[2]

Unless a fundamental interest or a suspect class is involved, statutory classifications are tested against the "traditional" or "restrained" standard of review applicable to most economic and social welfare legislation. (*Weber* v. *City Council* (1973) 9 Cal.3d 950, 958-959 [109 Cal.Rptr. 553, 513 P.2d 601].) Although the "traditional" test has been set out in various formulas, they all require in substance that the classifications created by the state be rationally related to a legitimate state purpose and tailored to accomplish that purpose. (*Cooper* v. *Bray* (1978) 21 Cal.3d 841, 847-848 [148 Cal.Rptr. 148, 582 P.2d 604]; *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].)

Two classes of parents are created by section 11350. Both classes are noncustodial parents, in practice generally fathers, against whom there is

[2]At trial Thompson argued that section 11350 is also violative of equal protection because it permits recovery of benefits paid for support of both mother and child. This provision, he argues, makes a father who has never married the child's mother liable for spousal support, an obligation which he would not otherwise have.

The trial court did not reach the constitutionality of this aspect of section 11350. In effect, the court found that Thompson lacked standing to raise the issue because his child support obligation was only $50 per month, an amount which the court judicially noticed was insufficient to support a minor child, much less its mother, for a month's time. Because the trial court did not reach the constitutionality of the noncustodial parent's liability for recoupment of spousal support, we do not do so either.

no court order for child support. If the parent having custody of the minor child receives public assistance in the form of AFDC payments, then the noncustodial parent may be obliged to reimburse the county for such payments under section 11350 to the extent that the reimbursement does not exceed the parent's ability to pay. No such liability exists, however, for a similarly situated parent whose child does not receive public assistance. That parent will only be liable prospectively for child support payments once they are set by a court support order. The parent whose child was not on public assistance has no liability for the child's support prior to the commencement of the action seeking support.

Neither party contends that noncustodial parents of children on public assistance are a suspect class, or that the liability imposed upon such parents by section 11350 impinges upon a fundamental interest. Therefore, the appropriate standard of review is the traditional or rational purpose test employed by the trial court.

■ Under the "traditional" or "restrained" standard of review our task on appeal is to conduct " 'a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals' . . . ." (*Newland* v. *Board of Governors, supra,* 19 Cal.3d at p. 711.) As preamble to that inquiry it is necessary, however, to look briefly at the nature of the AFDC benefit program under which San Francisco was seeking reimbursement.

### A. *Federal AFDC Scheme*

AFDC has been characterized as an exercise in " 'cooperative federalism' . . . ." (*Mitchell* v. *Swoap* (1973) 35 Cal.App.3d 879, 883 [113 Cal.Rptr. 75].) It is a grant-in-aid program established by the federal government and governed in turn by federal statute, federal regulation, state statute and state regulation. (*County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 739 [97 Cal.Rptr. 385, 488 P.2d 953]; *Del Costello* v. *State of California* (1982) 135 Cal.App.3d 887, 891 [185 Cal.Rptr. 582].)

Federal statutes and regulations require that parent recipients of AFDC assign to the state as a condition of receiving benefits any rights to support which they or their children may have. (42 U.S.C. § 602(a)(26)(A); 45 C.F.R. § 232.11 (1984).) The federal government requires states to maintain programs for establishing paternity of AFDC children born out of wedlock. (42 U.S.C. § 654; 45 C.F.R. § 302.31 (1984).)

Under federal law a noncustodial parent is liable to reimburse the state either for the amount specified in a court support order or, if there is no

court order, for the "amount determined by the State in accordance with a formula approved by the Secretary . . . ." (42 U.S.C. § 656(a)(1).) A state formula which fulfills this requirement is defined in the accompanying regulation as another "legal process as established by State laws, such as an administrative hearing process or a legally enforceable and binding agreement . . . ." (45 C.F.R. § 302.50(a)(2) (1984).) ■ To the extent California's section 11350 seeks reimbursement of benefit funds paid before there has been a support order or an administrative determination of paternity, the section is not mandated by federal AFDC law or regulation.

## B. *California Law*

■ Section 11350 is one of various statutes which require responsible relatives to reimburse the state for support payments. Similar "responsible relative" legislation has been consistently upheld against equal protection challenges. (*Swoap* v. *Superior Court* (1973) 10 Cal.3d 490, 502-507 [111 Cal.Rptr. 136, 516 P.2d 840] [adult child must reimburse for aid furnished needy or poor parent]; *In re Ricky H.* (1970) 2 Cal.3d 513, 518-521 [86 Cal.Rptr. 76, 468 P.2d 204] [parent must reimburse cost of counsel provided child in juvenile proceeding]; *In re Dudley* (1966) 239 Cal.App.2d 401, 404-412 [48 Cal.Rptr. 790] [parent must reimburse for commitment of mentally deficient child]; *County of Alameda* v. *Kaiser* (1965) 238 Cal.App.2d 815, 817-818 [48 Cal.Rptr. 343] [parent must reimburse hospital costs of child].)

California's responsible relative statutes are modern descendants of the 17th century Elizabeth Poor Law which imposed support obligations for the poor and needy upon those of their relatives able to pay. (tenBroek, *California's Dual System of Family Law: Its Origin, Development, and Present Status, Part I* (1964) 16 Stan.L.Rev. 257.) Liability under the Poor Law for illegitimate children extended only to the mother and the putative father because, as Professor tenBroek explains, "[n]atural duty, moral responsibility, and voluntary assumption of liability by the act of begetting point[ed] at least to the parent . . . ." (*Id.,* at pp. 283, 285.)

Section 11350 is but the most recent attempt by the state to encourage recovery of aid payments made to needy children from parents who have failed to meet their support obligation. In 1955, in response to ever lengthening welfare rolls, the Legislature added section 1506.5, predecessor to section 11350.[3] The new section authorized counties to bring suit against a

---

[3]Section 1506.5 provided in pertinent part: "If at any time during the continuance of aid under this chapter the county . . . determines that the parent of a recipient has been gainfully employed or has had sufficient assets to enable him to reasonably assist the recipient during

parent with ability to pay in order to recover benefits previously paid on behalf of a needy child. The statute was a specific response to the mushrooming costs of the aid to needy children program. As the committee report on the bill explained, "To provide assistance to a needy child when the father is deceased, incapacitated or confined in a medical or penal institution is a responsibility of society. However, to provide public assistance to a needy child while permitting the father to evade his moral responsibility to provide support for his child due to lax enforcement policies and practices has created a growing concern among legislators and citizens interested in *maintaining present standards of assistance* to needy children." (Italics added.) (Interim Committee on Social Welfare: The Absent Father Problem in the Aid to Needy Children Program, Rep. (1955) Appen. to 3 Sen. J. (1955 Reg. Sess.) p. 7.) It is clear from the concerns voiced by the Legislature when it adopted section 1506.5 that the Legislature intended recoupment of benefit payments to alleviate the burden on taxpayers and to ensure that as the number of needy children rose benefits to each child would not be reduced.

Relieving the public of the economic burden of support for the impoverished is a legitimate state purpose. (*Swoap* v. *Superior Court, supra,* 10

---

the period in which the child was receiving aid, it may . . . bring suit against the parent to recover the amount of assistance paid under the provisions of this chapter . . . ." (Added by Stats. 1955, ch. 1253, § 1, p. 2286.)

Section 1506.5 was renumbered 11350. (Stats. 1965, ch. 1784, § 5, p. 4010.) Section 11350 was repealed and replaced with the following language in 1971: "In any case of separation or desertion of a parent or parents from their spouse and child or children which results in aid being granted under this chapter to such spouse and child or children, such parent or parents shall be obligated to the county for an amount equal to: (a) the value of the aid received by such family during such period of separation or desertion with respect to such spouse and child or children, reduced by (b) any amount actually paid by such parent or parents for the support and maintenance of such spouse and child or children during such period, if and to the extent that such amount reduces the aid received; except that in any case where an order for the support and maintenance of such spouse and child or children has been issued by a court of competent jurisdiction, the obligation under this section shall not exceed the amount specified in such order less any amount actually paid by such parent or parents during such period. In the absence of such an order, the district attorney shall bring suit for enforcement of support pursuant to this section. Any payments required pursuant to this section shall be reasonably based on ability to pay." (Added by Stats. 1971, ch. 578, § 25.5, p. 1158.)

Current section 11350 was added in 1975. It provides in pertinent part: "In any case of separation or desertion of a parent or parents from a child or children which results in aid under this chapter being granted to such family, the noncustodial parent or parents shall be obligated to the county for an amount equal to: [¶] (a) [t]he amount specified in an order for the support and maintenance of such family . . . or in the absence of such court order, [¶] (b) [t]he amount of aid paid to the family during such period of separation or desertion limited by such parent's reasonable ability to pay during that period in which aid was granted; and [¶] (c) [s]uch obligation shall be reduced by any amount actually paid by such parent . . . . [¶] The district attorney shall take appropriate action pursuant to this section in the superior court of the county which provided aid under this chapter. . . ." (Stats. 1975, ch. 924, § 5, p. 2032.)

Cal.3d at p. 506.) Likewise, the state has a legitimate interest in maximizing the benefit payments it can make to all needy children. (See, e.g., *Dandridge* v. *Williams* (1970) 397 U.S. 471, 483-486 [25 L.Ed.2d 491, 500-502, 90 S.Ct. 1153].)

■ The remaining question before us is whether the state's use of section 11350 to impose presupport order liability on noncustodial parents is tailored to achieve the Legislature's goals. Before a custodial mother applies for AFDC she may or may not have any real motive to establish paternity and to receive an order of support. As Justice O'Connor has cogently argued in another context, the mother may decline to establish paternity for fear of antagonizing the father or because she prefers not to subject herself and her child to the social stigma attached to such a proceeding. (*Mills* v. *Habluetzel* (1982) 456 U.S. 91, 105, fn. 4 [71 L.Ed.2d 770, 781-782, 102 S.Ct. 1549] [conc. opn. of O'Connor, J.].) In applying for AFDC, however, she assigns her support rights to the state. (42 U.S.C. § 602(a)(26)(A); § 11477, subd. (a).) Although the state has a motive to seek a declaration of paternity, the practical realities of bringing that action will often mean that the paternity determination is not or cannot be made promptly. The state, however, assumes the obligation to deliver benefits as soon as it finds the child eligible to receive them.

By enacting section 11350 the Legislature has chosen to commence the noncustodial parent's liability for child support with the grant of benefits rather than with the issuance of a support order. The practical effect of that decision is not, however, to create unlimited liability in the noncustodial parent. ■ The three-year statute of limitations period created by Code of Civil Procedure section 338, subdivision 1, applies to recoupment actions brought under section 11350. (*County of San Mateo* v. *Booth* (1982) 135 Cal.App.3d 388, 399 [185 Cal.Rptr. 349]; *Amie* v. *Superior Court* (1979) 99 Cal.App.3d 421, 427 [160 Cal.Rptr. 271].)

■ In seeking recoupment of AFDC benefits from noncustodial parents with the ability to pay the state is acting to enforce parental support duty and to recover welfare money it has spent because the noncustodial parent has not met that support duty. Recovered funds can both reduce the outlay of tax monies and ensure that maximum benefit levels are maintained. Section 11350 is a reasonably tailored means by which to achieve these goals.

We find that there is a rational basis upon which the Legislature has chosen to impose upon noncustodial parents liability for public assistance benefits paid prior to issuance of an order of child support. Accordingly, we reverse the judgment of the trial court and remand for determination of

Thompson's reimbursement liability for AFDC benefits paid on behalf of his daughter prior to April 1, 1981.

The judgment is reversed. The cause is remanded to the trial court for further proceedings consistent with this opinion.

Anderson, P. J., and Sabraw, J., concurred.

A petition for a rehearing was denied October 25, 1985, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied December 18, 1985.